| |
|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** |
| *Caption in Compliance with D.N.J. LBR 9004-1(b)* <br> **Edmond M. George, Esquire** <br> **Turner N. Falk, Esquire** <br> **OBERMAYER REBMANN MAXWELL & HIPPEL LLP** <br> **1120 Route 73, Suite 420** <br> **Mount Laurel, NJ 08054-5108** <br> **(856) 795-3300** <br> *Counsel to the Debtors* |

In re:

EDWARD J. HOVATTER and KIMBERLY
MACALUSO HOVATTER,

                          Debtors.

Case No. 19-31483-ABA

Chapter 11

Judge:  Andrew B. Altenburg

## THIRD MODIFIED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE DESCRIBING THE CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE DEBTORS EDWARD J. HOVATTER AND KIMBERLY MACALUSO HOVATTER

**PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY. THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THIS PLAN OF REORGANIZATION. THE PLAN PROPONENT BELIEVES THAT THIS PLAN OF REORGANIZATION IS IN THE BEST INTEREST OF THE CREDITORS AND THAT THE PLAN IS FAIR AND EQUITABLE. THE PROPONENT URGES THAT THE VOTER ACCEPT THE PLAN.**

Dated:

5/20/2020

5/20/2020

Proponents:  Edward J. Hovatter and
Kimberly Macaluso Hovatter

DocuSigned by:

*Edward Hovatter*

Edward J. Hovatter

DocuSigned by:

*Kimberley Hovatter*

Kimberly Macaluso Hovatter

## TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| I. | INTRODUCTION ……………………………………………….…..... | | 1 |
| | A. | Purpose of This Document | 2 |
| | B. | Confirmation Procedures | 3 |
| | | 1. Time and Place of the Confirmation Hearing ................... | 4 |
| | | 2. Deadline For Voting For or Against the Plan ..................... | 4 |
| | | 3. Deadline For Objecting to the Confirmation of the Plan … | 4 |
| | | 4. Identity of Person to Contact for More Information Regarding the Plan ........................................................ | 4 |
| | C. | Disclaimer …………………………………………………….. | 5 |
| | | | |
| II. | BACKGROUND ……………………………………………………. | | 6 |
| | A. | Description and History of the Debtor's Business ........................... | 6 |
| | B. | Principals/Affiliates of Debtor's Business ..................................... | 6 |
| | C. | Management of the Debtor Before the Bankruptcy ......................... | 6 |
| | D. | Events Leading to Chapter 11 Filing ............................................. | 6 |
| | E. | Significant Events During the Bankruptcy ..................................... | 8 |
| | | 1. Bankruptcy Proceedings | 8 |
| | | 2. Other Legal Proceedings | 9 |
| | | 3. Actual and Projected Recovery of Preferential or Fraudulent Transfers | 13 |
| | | 4 Procedures Implemented to Resolve Financial Problems | 13 |
| | | 5. Current and Historical Financial Conditions | 14 |
| | | | |
| III. | SUMMARY OF THE PLAN OF REORGANIZATION .............................. | | 14 |
| | A. | What Creditors and Interest Holders Will Receive Under the Proposed Plan ........................................................................... | 14 |
| | B. | Unclassified Claims ..................................................................... | 14 |
| | | 1. Administrative Expenses and Fees | 15 |
| | | 2. Priority Tax Claims | 17 |
| | C. | Classified Claims and Interests ..................................................... | 18 |
| | | 1. Classes of Secured Claims | 18 |
| | | 2. Classes of Priority Unsecured Claims | 21 |
| | | 3. Class of General Unsecured Claims | 22 |
| | | 4. Class(es) of Interest Holders | 24 |
| | D. | Means of Effectuating the Plan ..................................................... | 25 |
| | | 1. Public Auction or New Value Contribution……………….. | 25 |
| | | 2. Completion Amount……………………………………….. | 27 |
| | | 3. Funding for the Plan …………………………………….. | 28 |
| | | 4. Sale of the Hammonton Property…………………………. | 29 |
| | | 5. Illustration of Application of Funding Sources…………… | 30 |
| | | 6. Postconfirmation Management…………………………… | 31 |
| | | 7. Disbursing Agent………………………………………….. | 31 |
| | E. | Other Provisions of the Plan ......................................................... | 32 |

|   |   | 1. | Executory Contracts and Unexpired Leases | 32 |
|   |   | 2. | Changes in Rates Subject to Regulatory Commission Approval | 32 |
|   |   | 3. | Retention of Jurisdiction | 32 |
|   |   | 4. | Procedures for Resolving Contested Claims | 32 |
|   |   | 5. | Effective Date | 33 |
|   |   | 6. | Modification | 33 |
|   | F. | | Tax Consequences of Plan | 33 |
|   | G. | | Risk Factors | 33 |
| IV. | | | CONFIRMATION REQUIREMENTS AND PROCEDURES | 34 |
|   | A. | | Who May Vote or Object | 35 |
|   |   | 1. | Who May Object to Confirmation of the Plan | 35 |
|   |   | 2. | Who May Vote to Accept/Reject the Plan | 35 |
|   |   |   | a. What Is an Allowed Claim/Interest | 35 |
|   |   |   | b. What Is an Impaired Claim/Interest | 35 |
|   |   | 3. | Who Is Not Entitled to Vote | 36 |
|   |   | 4. | Who Can Vote in More Than One Class | 36 |
|   |   | 5. | Votes Necessary to Confirm the Plan | 37 |
|   |   | 6. | Votes Necessary for a Class to Accept the Plan | 37 |
|   |   | 7. | Treatment of Nonaccepting Classes | 37 |
|   |   | 8. | Request for Confirmation Despite Nonacceptance by Impaired Class(es) | 38 |
|   | B. | | Liquidation Analysis | 38 |
|   | C. | | Feasibility | 40 |
| V. | | | EFFECT OF CONFIRMATION OF PLAN | 40 |
|   | A. | | Discharge | 41 |
|   | B. | | Revesting of Property in the Debtors | 41 |
|   | C. | | Modification of Plan | 41 |
|   | D. | | Post-Confirmation Conversion/Dismissal | 42 |

OMC\4850-8836-4733.v3-5/20/20

# I.

## INTRODUCTION

Edward J. Hovatter and Kimberly Macaluso Hovatter are the Debtors in a Chapter 11 bankruptcy case (collectively the "Debtors"). On November 14, 2019, the Debtors filed a petition for relief under Chapter 11 of the U.S. Bankruptcy Code (the "Code"), 11 U.S.C. §101, *et seq.*, in the U.S. Bankruptcy Court for the District of New Jersey under petition No. 19-31483 (the "Bankruptcy"). Debtor Edward J. Hovatter is an attorney; Debtor Kimberly Macaluso Hovatter is a billing clerk.  The Code allows the Debtors, and under some circumstances, creditors and other parties in interest, to propose a plan of reorganization ("Plan"). The Plan may provide for the Debtors to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both.  The Debtors as Debtors in Possession are the party proposing the Plan sent to you in the same envelope as this document. THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE PLAN WHICH IS ATTACHED HERETO AS **EXHIBIT A**.

This is a reorganization plan under Section 1123 of the Code. In other words, the Proponents seeks to accomplish payments under the Plan by the liquidation of some assets (including the Affirmative Litigation and the Hammonton Property), the provision of a potential New Value Contribution, and the contribution of such of the Debtors' Disposable Income as is necessary to fund the Plan.  The Plan contemplates current payments to certain parties, the payment of certain Secured Claims from the proceeds of sale of assets securing those claims, and deferred payments to other parties.

1

A.    **Purpose of This Document**

This Disclosure Statement summarizes what is in the Plan, and tells you certain

information relating to the Plan and the process the Court follows in determining whether or not

to confirm the Plan.

<u>**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO**</u>

<u>**KNOW ABOUT**</u>:

(1)    **WHO CAN VOTE OR OBJECT,**

(2)    **THE PROPOSED TREATMENT OF YOUR CLAIM (i.e., what your claim**

**will receive if the Plan is confirmed), AND HOW THIS TREATMENT**

**COMPARES TO WHAT YOU WOULD RECEIVE IN LIQUIDATION,**

(3)    **THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS**

**DURING THE BANKRUPTCY,**

(4)    **WHAT THE COURT WILL CONSIDER WHEN DECIDING WHETHER**

**TO CONFIRM THE PLAN,**

(5)    **THE EFFECT OF CONFIRMATION, AND**

(6)    **THE FEASIBILITY OF THE PLAN.**

This Disclosure Statement cannot tell you everything about your rights. You should

consider consulting your own lawyer to obtain more specific advice on how this Plan will affect

you and what is the best course of action for you.

Be sure to read the Plan as well as the Disclosure Statement. If there are any

inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

Code Section 1125 requires a Disclosure Statement to contain "adequate information"

concerning the Plan. The term "adequate information" is defined in Code Section 1125(a) as

OMC\4850-8836-4733.v3-5/20/20

"information of a kind, and in sufficient detail," about a debtor and its operations "that would

enable a hypothetical reasonable investor typical of holders of claims or interests" of the Debtors

to make an informed judgment about accepting or rejecting the Plan. The Bankruptcy Court

("Court") has determined that the information contained in this Disclosure Statement is adequate,

and it has approved this document in accordance with Code Section 1124.

This Disclosure Statement is provided to each creditor whose claim has been scheduled

by the Debtors, or who has filed a proof of claim against the Debtors and to each interest holder

of record as of the date of approval of this Disclosure Statement. Under the Bankruptcy Code,

your acceptance of the Plan may not be solicited unless you receive a copy of this Disclosure

Statement prior to or concurrently with such solicitation.

**B.** **Confirmation Procedures**

<u>Person Potentially Eligible to Vote on the Plan</u>

In determining acceptance of the Plan, votes will only be counted if submitted by a

creditor whose claim is duly scheduled by the Debtors as undisputed, non-contingent and

unliquidated, or who, prior to the hearing on confirmation of the Plan, has filed with the Court a

proof of claim which is not subject to a pending objection, or has not been disallowed or

suspended prior to computation of the votes on the Plan. The Ballot Form that you received does

not constitute a proof of claim. If you are uncertain whether your claim has been correctly

scheduled, you should check the Debtors' Schedules, which are on file at the office of the Clerk

of the Bankruptcy Court located at: United States Bankruptcy Court, U.S. Court House, 401

Market St., Camden, NJ 08102.  The Clerk of the Bankruptcy Court will not provide this

information by telephone.

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS

DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT

YET BINDING ON ANYONE. HOWEVER, IF THE COURT LATER CONFIRMS THE

PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTORS AND ON ALL

CREDITORS AND INTEREST HOLDERS IN THIS CASE.

      1.     **Time and Place of the Confirmation Hearing:** The hearing at which the

Court will determine whether to confirm the Plan will take place on _____, at

_____ a.m./p.m., in Courtroom No. 4B, 401 Market St, Camden, NJ 08102.

      2.     **Deadline for Voting For or Against the Plan:** If you are entitled to vote,

it is in your best interest to timely vote on the enclosed ballot and return the ballot in the

enclosed envelope to:

        Edmond M. George, Esquire
        OBERMAYER REBMANN MAXWELL & HIPPEL LLP
        1120 Route 73, Suite 420
        Mount Laurel, NJ 08054

      Your ballot must be received by 5:00 PM on _____ for your

ballot to be counted. Ballots received after the deadline will not be counted.

      3.     **Deadline For Objecting to the Confirmation of the Plan:** Objections to the

confirmation of the Plan must be filed with the Court and served upon Counsel to the Debtors at

the Address above, by _____.

      4.     **Identity of Person to Contact for More Information Regarding the Plan:**

Any interested party desiring further information about the Plan should contact counsel to

the Debtor:

        Edmond M. George, Esquire
        OBERMAYER REBMANN MAXWELL & HIPPEL LLP
        1120 Route 73, Suite 420

OMC\4850-8836-4733.v3-5/20/20

Mount Laurel, NJ  08054
Tel:  (215) 665-3140
Email :  edmond.george@obermayer.com

## C.    Disclaimer

The financial data relied upon in formulating the Plan is based on estimates and actual historic information, as well as the Debtors' Monthly Operating Reports ("MOR's"). The information contained in this Disclosure Statement is provided by the Debtors in possession as Plan Proponent. The Plan Proponent represents that everything stated in the Disclosure Statement is true to the Proponent's best knowledge.

**PLEASE NOTE THAT THE APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A RULING ON THE MERITS, FEASIBILITY OR DESIRABILITY OF THE PLAN.**

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

OMC\4850-8836-4733.v3-5/20/20

## II.

## BACKGROUND

### A.    Description and History of the Debtor's Business

Edward J. Hovatter ("Hovatter"), an attorney, and Kimberly Macaluso Hovatter ("Macaluso"), a billing clerk, are the husband and wife joint Debtors in this Bankruptcy. Hovatter has worked in real estate and transactional law for decades; Macaluso has been a billing clerk at a number of law firms for over a decade.

### B.    Principals/Affiliates of Debtors

Debtor Hovatter practices law through his wholly-owned entity Edward J. Hovatter Law LLC t/a Hovatter Law.  Hovatter Law is an independent contractor with the law firm of Lauletta Birnbaum.  Macaluso is an employee of Lauletta Birnbaum.

Hovatter is the Managing Member of Hovatter Friedman Saputelli & Levi LLP ("HFSL"), a defunct law firm which owns valuable accounts receivable and causes of action. HFSL is currently in chapter 7 bankruptcy and is being administered by chapter 7 trustee Andrew Sklar, Esquire.

The Edward J. Hovatter Irrevocable Trust is an irrevocable trust established November 4, 2011.  It owns unmatured life insurance policies.  Macaluso is the trustee of the trust; Macaluso and the Debtors' children are the beneficiaries of the trust.

### C.    Management of the Debtor Before and During the Bankruptcy

The Debtors operated their own household both pre-petition and post-petition.   Hovatter operated Hovatter Law both pre-petition and post-petition.

### D.    Events Leading to Chapter 11 Filing

Below is a brief summary of the circumstances that led to the filing of this Chapter 11:

In 2014, Hovatter formed a law firm named Hovatter Friedman Stofman PC with several

other partners including D. Max Friedman ("Max") and Marc Stofman. In exchange for making

Max a partner, Max's parents Kenneth and Randi Friedman (the "Friedmans") extended that firm

a loan of $250,000.00 secured by the firm's property and required the Debtors to personally

guaranty one third of the loan.

Marc Stofman left the firm, and Gary Levi and Gregory Saputelli joined; the firm was

renamed Hovatter Friedman Saputelli & Levi PC. As before, Hovatter generated the majority of

the business and receivables for this firm; the other partners were net financial losses or did not

justify their overhead.

At the end of 2016, by agreement, the firm formally wound up its business and closed.

The partners began practicing law through the newly-formed Hovatter Friedman Saputelli &

Levi LLP ("HFSL") on January 1, 2017. The underperformance of the other partners persisted

in the new firm; Hovatter generated some 85% of the firm's business and receivables. In mid-

2017, Max approached Hovatter and stated that he intended to begin practicing in large estate

administration, a field in which he had no expertise or clients. Hovatter acceded to this request,

but Max changed his mind again and selected another subject in which he had no experience or

clients. After these disagreements, plus other financial difficulties between the partners, the

partners agreed to finish out 2017, then dissolve HFSL. Max immediately stopped working for

HFSL; other partners and associates soon followed. HFSL clients were abandoned and accounts

receivable were not collected. A large portion of Hovatter's book of business was lost during the

collapse of HFSL.

Around the same time, Hovatter began to experience health issues that required medical

attention. HFSL had copious accounts receivable, but no one at HFSL aside from Hovatter was

DocuSign Envelope ID: 78475248-E556-4EA2-A354-A8842A5E59A1

able to collect on them. The Debtors were forced to make early withdrawals from their retirement accounts to cover medical and ordinary bills.

In February 2018, the Friedmans commenced a suit against HFSL and the Debtors for the unpaid loan to the dissolved firm. Gary Levi joined this suit as well, seeking payment from HFSL for a capital contribution that had been fully returned long ago.

In May 2018, a court appointed Charles N. Persing as receiver (the "Receiver") of HFSL and made the Debtors personally liable for costs incurred in the receivership. The Debtors dispute the validity of the order appointing the Receiver, as it was entered without appropriate due process, and was based upon a fraud upon the court in that the Friedmans were not secured creditors of HFSL.

At the time the Receiver was appointed, HFSL held approximately $1,000,000.00 in collectable accounts receivable. The Receiver subsequently recovered only 10% of the accounts receivable due to HFSL, lost approximately 50% of the collectable receivables to write-offs and bankruptcies, and ran up a bill of $183,000.00 he sought to collect from the Debtors. The Receiver's acts did not appreciably pay down the Debtors' liability on the guaranty to the Friedmans. The Debtors dispute any liability to the Receiver.

The receivership and collections litigation disrupted Hovatter's book of business and severely decreased his income. The combination of Hovatter's health issues, the loss of his book of business, the Friedman suit and the Receiver liability exhausted the Debtors' financial resources. On November 14, 2019, HFSL and then the Debtors filed for bankruptcy.

E.    **Significant Events During the Bankruptcy**

1.    **Bankruptcy Proceedings**

OMC\4850-8836-4733.v3-5/20/20

The following is a chronological list of significant events which have occurred during this case:

The Court has authorized the sale of the Hammonton Property for $335,000.00.  As discussed in greater detail in Part III.D.4 below, Confirmation of the Plan authorizes the distribution and application of proceeds of the sale of the Hammonton Property.

The Court has approved the employment of the following professionals:

Obermayer Rebmann Maxwell and Hippel LLP and Edmond M. George, Esquire as counsel to the Debtors.

Miller Coffey Tate LLP and Matthew Tomlin as accountant to the Debtors.

Michael J. Lange Jr. as Appraiser to the Debtors.

Albert Casalnova as Realtor to the Debtors.

### 2.    Other Legal Proceedings

The Debtors have initiated or intend to initial various legal actions described below to reduce Creditor Claims and recover affirmatively on prepetition causes of action belonging to the Debtors.  The Chapter 7 Trustee of HFSL has raised the issue of whether these claims belong, wholly or partially, to the Debtors or to HFSL.  The Debtors maintain that they own the Affirmative Litigation described below, have standing to pursue it, and that any recovery on Affirmative Litigation belongs to the Debtors and not the bankruptcy estate of HFSL.  All parties specifically reserve their respective rights and defenses, including those relating to the issue of standing, which may be asserted in any Affirmative Litigation.  The Debtors reserve the right to settle, compromise, withdraw, stipulate, allocate, purchase, sell, pursue, jointly or individually, the Affirmative Litigation, or otherwise negotiate the right to bring or settle claims or share the distribution of proceeds of such claims with the Chapter 7 Trustee of HFSL.

9

The Debtors have initiated the following litigation seeking affirmative recovery:

a.   **Debtors v. the Friedmans:** The Debtors have instituted a suit objecting to the

Friedmans' claim filed in this case and seeking affirmative recovery for the

Friedmans' fraud and fraudulent inducement.  The Friedmans' claim as filed is

overstated by at least $180,000.00, and may be disallowed altogether.  The

Friedmans procured the loan by misrepresenting that their son Max would also

guaranty it, while knowing he never would.  Additionally, the Friedmans used the

loan and the guaranty in bad faith to harass and harm the Debtors after Max and

Hovatter had a falling out that resulted in the closure of HFSL.  The estimated

value of this suit is a reduction in the Friedmans' claim by $180,000.00 and

$100,000.00 in affirmative recovery.

b.   **Debtors v. the Friedmans and Flaster/Greenberg:** The Debtors have instituted

a proceeding to recover damages for a willful violation of the automatic stay.

After HFSL and the Debtors filed their bankruptcies, counsel at

Flaster/Greenberg, purportedly acting on behalf of the Friedmans, requested that

proceedings continue in the Friedmans' suit notwithstanding the stay.  The

Debtors incurred counsel fees and costs as a result of this intentional violation.

The estimated value of this suit is in excess of $10,000.00.

c.   **Debtors v. Max:** The Debtors have instituted a suit to recover from Max for his

breaches of the HFSL partnership agreement and his fiduciary duties to Hovattter

as his partner.  Max failed to bring business opportunities to HFSL, never brought

in enough business to justify his salary, lied about having executed a personal

guaranty of the loan from his parents and quit the firm immediately after agreeing

10

to work through the end of 2017 as part of an orderly wrap-up. The estimated value of this suit is in excess of $50,000.00.

    **d.  Debtors v. HFSL:** The Debtors may institute a proceeding to recover from HFSL pursuant to Hovatter's right to indemnification and defense by HFSL, and for any net proceeds HFSL may distribute to partners. As HFSL is in bankruptcy, Hovatter has filed a proof of claim for indemnification and reimbursement of legal fees and costs incurred in performing HFSL business. If HFSL's bankruptcy concludes before the completion of the Plan, the Debtors may pursue litigation in an appropriate forum. The estimated value of this recovery exceeds $25,000.00.

The Debtors are contemplating litigation (together with the above pending suits, the "Affirmative Litigation") against the following parties, any recovery from which will be a source of payments under the Plan:

    **e.  Debtors v. the Receiver:** The Debtors intend to initiate a suit objecting to the Receiver's claim filed in this case and seeking affirmative recovery for the Receiver's fiduciary breach during the receivership and for his tortious acts outside the scope of his powers as a receiver. The Receiver ran up unjustifiable costs and did not recover substantial money for HFSL. He permitted collectable accounts receivable to go stale or be discharged in bankruptcy, and paid out on claims that were not valid against HFSL. He also interfered with Hovatter's attempts to rebuild a law practice after HFSL. The estimated value of this suit is a reduction of the Receiver's claim by $182,986.87 and an affirmative recovery in excess of $100,000.00. Counsel for the Receiver has raised the issue of whether

the Debtors have standing to pursue these claims, or any claims against the Receiver, or whether these claims belong exclusively to HFSL.  The Debtors maintain that they have standing to bring these individual claims.  The Receiver has also contested the validity of any claim against him as alleged by the Debtors and the Chapter 7 Trustee of HFSL.    All parties specifically reserve their respective rights and defenses, including those relating as to the issue of standing, which may be asserted in any Affirmative Litigation against the Receiver.  The Debtors reserve the right to settle, compromise, withdraw, stipulate, allocate, purchase, sell, pursue, jointly  or individually, the claims against the Receiver, or otherwise negotiate the right to bring or settle claims or share the distribution of proceeds of such claims with the Chapter 7 Trustee of HFSL.

 **f.** **Debtors v. Matthew Weisberg and Gary Schafkopf:** The Debtors will retain an expert to evaluate whether Matthew Weisberg, their counsel during much of the Friedman and Madison Ventures lawsuits, and/or Gary Schafkopf, their counsel for the remainder of those suits, committed legal malpractice.  Pursuant to the advice of the retained expert, the Debtors may initiate suit.  Matthew Weisberg did not object to the order appointing the Receiver, which improperly imposed personal liability on the Debtors, attempted to set out affirmative counterclaims but did not join the individuals who were the targets of those counterclaims, and frequently advised the Debtors to give up the suit and pay in full claims for which they were at most 1/3 liable as limited guarantors.  Gary Schafkopf failed to conduct discovery, failed to obtain HFSL's settlement terms for the Madison

12

Ventures lawsuit and brokered a settlement in which Hovatter paid an entity that was liable to him.  The estimated value of this suit is in excess of $25,000.00.

g.  **Debtors v. Madison Ventures LLC, Inch X Inch Construction LLC, Paul DiFiore and P. DiFiore Enterprises Inc.:** After analysis of the strength of the available defenses to such an action, the Debtors may institute an avoidance action under state law or the Bankruptcy Code to avoid a preferential or fraudulent transfer.  The Debtors possessed an agreement of sale with Madison Ventures LLC for a portion of a unit it was constructing.  Madison Ventures breached the agreement of sale.  Within ninety (90) days of the petition date, Madison Ventures obtained a settlement by which Hovatter lost his right to purchase the unit, and was required to pay $28,000.00.  This allowed Madison Ventures to receive far more than it would have received in a liquidation.  The associated companies are all wholly owned by Paul DiFiore and participated in wrecking the agreement to sell by improperly driving up costs of construction.

3.  **Actual and Projected Recovery of Preferential or Fraudulent Transfers**

The Debtors are examining the terms of a settlement with Madison Ventures for a potential avoidable transfer.  If avoidable, the Madison Ventures avoidance cause of action is worth approximately $73,000.00 or more.

4.  **Procedures Implemented to Resolve Financial Problems**

In an effort to remedy the problems that led to the bankruptcy filing, the Debtors have entered an agreement of sale for the Hammonton Property, ceased gifting money to their children, attempted to rebuild Hovatter's book of business and generally curbed their daily spending.  Hovatter's health has improved, reducing ongoing medical expenses.  The Debtors are

13

employed at stable jobs that will allow Hovatter to rebuild his book of business and increase his

income back to pre-2014 levels, permitting a substantial contribution of Disposable Income to

the Plan.

### 5.    Current and Historical Financial Condition

Attached hereto as **EXHIBIT B** is the most recent Monthly Operating Report ("MOR")

filed by the Debtors.  The Debtors have not been making postpetition payments on debt secured

by the real property located at 414 14th Street, Hammonton NJ 08037 (the "Hammonton

Property").  The Debtors have entered an agreement to sell the Hammonton Property for a sum

sufficient to pay all secured debts on the property and generate net proceeds which will be paid

into the Plan.  This agreement of sale and the distribution of proceeds has been authorized by the

Court.  The Debtors are not postpetition current on the mortgage on their primary residence at 9

E. Aberdeen Road, Ocean City NJ 08226 (the "Primary Residence").  Hovatter's employer is

over 60 days delinquent in compensating him; once he is paid the Debtors will come postpetition

current on this mortgage.  The Debtors have otherwise been paying their current bills.

### III.

### SUMMARY OF THE PLAN OF REORGANIZATION

### A.    What Creditors and Interest Holders Will Receive Under the Proposed Plan

The Plan classifies claims and interests in various classes. The Plan states whether each

class of claims or interests is impaired or unimpaired. The Plan provides the treatment each class

will receive.

### B.    Unclassified Claims

Certain types of claims are not placed into voting classes. They are not considered

impaired and they do not vote on the Plan because they are automatically entitled to specific

DocuSign Envelope ID: 78475248-E556-4EA2-A351-A8842A5E50A1

treatment provided for them in the Bankruptcy Code. As such, the Proponent has <u>not</u> placed the following claims in a class:

### 1.    Administrative Expenses and Fees

Administrative expenses are claims for fees, costs or expenses of administering the Debtors' Chapter 11 case which are allowed under Code Section 507(a)(1), including all professional compensation requests pursuant to Sections 330 and 331 of the Code. The Code requires that all administrative expenses including fees payable to the Bankruptcy Court and the Office of the United States Trustee which were incurred during the pendency of the case must be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.

The following chart lists <u>all</u> of the Debtor's unpaid administrative fees and expenses ("Compensation"), an estimate of future professional fees and other administrative claims and fees and their treatment under the Plan:

| NAME | AMOUNT | TREATMENT | TYPE OF CLAIM |
|---|---|---|---|
| Albert Casalnova | $16,750.00 | To be paid in full on the effective date from escrowed proceeds of the Hammonton Sale. | Realtor |
| Cedar Design LLC | $14,991.24 | To be paid in full on the effective date from escrowed proceeds of the Hammonton Sale. | Contractor |
| Michael J. Lange Jr. | $700.00 | To be paid in full from the Funding Sources on the effective date. | Appraiser |
| Obermayer Rebmann Maxwell & Hippel LLP | $175,000.00 (estimated) | To be paid quarterly, pro rata with Miller Coffey Tate LLP from the Funding Sources. | Counsel to the Debtors |

15

| | | | |
|---|---|---|---|
| Miller Coffey Tate LLP | $30,000.00 (estimated) | To be paid quarterly, pro rata with Obermayer Rebmann Maxwell & Hippel LLP from the Funding Sources. | Accountant to the Debtors |
| Office of U.S. Trustee Fees | $350.00 (estimated) | Paid in full on Effective Date | |
| | **TOTAL: $237,091.24 (estimated)** | | |

**Court Approval of Professional Compensation Required:**

Pursuant to the Bankruptcy Code, the Court must rule on all professional compensation and expenses listed in this chart before the compensation and expenses will be owed. The professional in question must file and serve a properly noticed fee application for compensation and reimbursement of expenses and the Court must rule on the application. Only the amount of compensation and reimbursement of expenses allowed by the Court will be owed and required to be paid under this Plan as an administrative claim.

Each professional person who asserts a further administrative claim that accrues before the confirmation date shall file with the Bankruptcy Court, and serve on all parties required to receive notice, an application for compensation and reimbursement of expenses no later than thirty (30) days after the Effective Date of the Plan. Failure to file such an application timely shall result in the professional person's claim being forever barred and discharged. Each and every other person asserting an administrative claim shall be entitled to file a motion for allowance of the asserted administrative claim within ninety (90) days of the Effective Date of the Plan, or such administrative claim shall be deemed forever barred and discharged. No motion or application is required to fix the fees payable to the Clerk's Office or Office of the United States Trustee. Such fees are determined by statute.

16

As indicated above, the Debtor will need to pay $237,091.24 worth of administrative claims and fees on or after the Effective Date of the Plan. Obermayer and Miller Coffey Tate LLP have agreed to be paid after the Effective Date.

**2.      Priority Tax Claims**

Priority tax claims are certain unsecured income, employment and other taxes described by Code Section 507(a)(8). The Code requires that each holder of such a Section 507(a)(8) priority tax claim receive the present value of such claim in deferred cash payments, over a period not exceeding five (5) years from the Petition Date.

Pursuant to 26 U.S.C. §1398, the Debtors will elect to close their 2019 tax year on the Petition Date.  The Internal Revenue Service, or the Debtors, may file a postconfirmation proof of claim for any prepetition amounts attributable to the shorted 2019 tax year.  Any Allowed amount in such proof of claim will be treated pursuant to the Plan.

The following chart lists all of the Debtor's Section 507(a)(8) priority tax claims and their treatment under the Plan:

| Description | Amount Owed | Treatment |
|---|---|---|
| Prepetition Income Taxes owed to Internal Revenue Service | $222,495.45 | Paid quarterly with interest at 5% or the interest rate in effect at the time of Confirmation, from the Funding Sources. This Claim will be paid within 5 years of the Petition Date.  Any federal tax refunds that become available during the Plan will first be used to offset prepetition federal tax liability. |
| Income Taxes owed to State of New Jersey, 2017 and 2018 tax years | $18,118.12 | Paid quarterly with interest at 7.75% or the interest rate in effect at the time of Confirmation, from the Funding Sources. This Claim will be paid within 5 years of the Petition Date.  Any state tax refunds that become available during the Plan will first be used to offset prepetition federal tax |

17

C.      **Classified Claims and Interests**

1.      **Classes of Secured Claims**

Secured claims are claims secured by liens on property of the estate. The following chart lists all classes of creditors containing the holders of the Debtors' secured pre-petition claims and their treatment under this Plan:

| CLASS # | DESCRIPTION | INSIDERS | IMPAIRED | TREATMENT |
|---------|-------------|----------|----------|-----------|
|         |             | (Y/N)    | (Y/N)    |           |
| **Class 1 Allowed Secured Claim of 360 Capital** | Class 1 consists of the Allowed Secured Claim of 360 based upon the 360 Loan Documents, to the extent allowed. This Claim is secured by a third-position lien on the Hammonton Property or the proceeds of sale. The Claim is $54,400.08 pursuant to 360's proof of claim. The Debtors are unsure of the value of the collateral underlying the 360 Secured Claim. | NO | YES | The Debtors will make no contract or adequate protection payments on account of this Claim, but the Debtor will post-petition pay currently all taxes on the collateral. At the closing on the Hammonton Property, 360 Capital shall hold $56,000.00 in escrow until the Effective Date of the Plan or June 30, 2020, whichever occurs first. When 360 Capital is permitted to apply the funds, it may apply the escrowed proceeds to pay principal and 6% interest, however, no default interest, attorney's fee or costs will be paid.<br><br>If 360 Capital holds proceeds in excess of the amount needed to satisfy its debt in full on the date it is permitted to apply the escrowed funds, 360 Capital shall return the excess proceeds to the Debtors, who shall distribute them pursuant to the Plan.<br><br>If the Hammonton Sale does not occur, the Debtors agree not to contest relief from the automatic stay. |

| Class 2 Allowed Secured Claim of Republic Bank | Class 2 consists of the Allowed Secured Claim of Republic Bank based upon a second lien position for a HELOC on the Hammonton Property. The Republic claim is $234,354.96, with prepetition arrears at $950.44 pursuant to Republic's proof of claim. The Debtors are unsure of the value of the collateral underlying the Republic Bank Secured Claim. | NO | YES | The Debtors will make no contract or adequate protection payments on account of this Claim, but the Debtor will post-petition pay currently all taxes on the collateral. This Claim will be paid in full at closing from proceeds of the sale of the Hammonton Property. Republic Bank has acknowledged that the sale is necessary to the Debtors' reorganization pursuant to the Plan, but may apply sale proceeds immediately upon receipt without condition or qualification.

If the Hammonton sale does not occur, the Debtors agree not to contest relief from the automatic stay or a foreclosure proceeding filed by Republic Bank. |

19

| Class 3 Secured Claim of Shellpoint Mortgage Servicing. | Class 3 consists of the Allowed Secured Claim Shellpoint, based upon the Shellpoint Loan Documents, to the extent Allowed. The collateral is a first priority Lien on the Primary Residence. The Shellpoint claim is listed at $1,894,628.93 with $1,754.79 of prepetition arrears, and as undisputed. Shellpoint holds postpetition payments of approximately $14,000.00 in suspense. | NO | YES | The Debtors intend to retain the Primary Residence on account of the New Value Contribution. The Debtors will: (i) cure prepetition arrears of $1,754.79; (ii) cure postpetition arrears of approximately $31,000.00 through April 2020, together with any additional un-paid mortgage payment which becomes due; (iii) pay $2,500.00 attributable to interest on Shellpoint's oversecured claim on or before September 1, 2020 or the Effective Date, whichever shall come sooner. Shellpoint shall apply all suspense funds towards this arrears cure. The Debtors will also make direct contract payments from the Effective Date forward directly to Shellpoint. The Debtors will post-petition pay currently all taxes and insurance on the property until the lien and Claim is paid in full. In light of the treatment set forth above, Shellpoint waives its rights to seek recovery of amounts owed for attorney's fees and default rate interest attributable to any pre-Confirmation default. The Debtors reserve their right to apply for a forbearance available under any applicable law. |

| **Class 4 Secured Claim of Citizens Bank** | Class 4 consists of the Allowed Secured Claim of Citizens Bank NA, based upon the Citizens retail installment agreement. The Citizens claim is $13,333.76 pursuant to Citizens' proof of claim, with no prepetition arrears. The collateral is a 2015 Mercedes Benz GLA-250. | NO | YES | The Debtors will retain the vehicle. The Debtors will pay this Claim in full through the Plan, with 6% interest.  Citizens Bank will retain its lien until it is paid in full. Citizens Bank waives all late fees, default interest any attorney's fees attributable to any preconfirmation default. |
|---|---|---|---|---|
| **Class 5 Secured Claim of Jersey Shore Federal Credit Union** | Class 5 consists of the Allowed Secured Claim of Jersey Shore Federal Credit Union based upon the Jersey Shore retail installment agreement.  Per the creditor's proof of claim, the claim is $14,811.72 with no prepetition arrears. The collateral is a 2015 Mercedes Benz C300. | NO | YES | The Debtors will retain the vehicle.  The Debtors will continue to make direct payments on the contract.  Jersey Shore Federal Credit Union will retain its lien until it is paid in full.  Jersey Shore Federal Credit Union waives the default caused by the filing of this Bankruptcy, and waives all late fees, default interest any attorney's fees attributable to this default. |

21

| Class 6 Secured Claim of Township of Hammonton | Class 6 consists of the Allowed Secured Claim of the Township of Hammonton, secured by a first position real estate tax lien on the Hammonton Property in the amount of $3,422.92, to the extent Allowed. | NO | YES | The Debtors will pay this Secured Claim upon the sale of the Hammonton Property. No payments will be made until the sale, but interest will continue to accrue at the statutory rate of 8% or the interest rate in effect at Confirmation. The Township of Hammonton shall not be entitled to default or penalty rate interest. |
|---|---|---|---|---|

**2.      Classes of Priority Unsecured Claims**

Certain priority claims that are referred to in Code Sections 507(a)(3), (4), (5), (6), and (7) are required to be placed in classes. These types of claims are entitled to priority treatment as follows: The Code requires that each holder of such a claim receive cash on the Effective Date equal to the allowed amount of such claim. However, a class of unsecured priority claim holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such claims.

The following chart lists all classes containing Debtor's 507(a)(3), (a)(4), (a)(5), (a)(6), and (a)(7) priority unsecured claims and their treatment under this Plan:

No such claims exist.  The Debtor has no unsecured claims entitled to priority.

**3.      Classes of General Unsecured Claims**

General unsecured claims are uncollateralized claims not entitled to priority under Code Section 507(a).

Class 7A consists of undisputed general unsecured creditors, whose Claims are allowed in the amount scheduled pursuant to 11 U.S.C. §1111, unless a creditor has filed a proof of

22

claim.  Between scheduled claims and proofs of claims, Class 7A currently consists of claims

totaling $91,334.41.

If the Debtors do not make the New Value Buyback, approximately $44,000.00 will be

available for general unsecured creditors, representing a minimum payment of approximately 8%

of these claims.  If the Debtors are successful in their objections to Class 7C and 7D claims, this

percentage will increase.  If the Debtors make the New Value Buyback, an additional

$50,000.00, representing approximately an additional 9%, will be paid to general unsecured

creditors.  The following chart identifies this Plan's treatment of the classes containing the

Debtors' general unsecured claims:

| CLASS# | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| Class 7A | Undisputed General Unsecured Claims of creditors.  These Claims include all General Unsecured Claims that do not belong to any other class, as well as any other unsecured deficiency claims not otherwise waived by a creditor in this Plan. | YES | Class 7A creditors will receive quarterly payment from the Funding Sources, sharing pro rata treatment with Class 7B, 7C and 7D creditors, until the Debtors have funded the Plan up to the Completion Amount.  If the Debtors make the New Value Buyback, that payment may also be shared pro rata between general unsecured classes. |

OMC\4850-8836-4733.v3-5/20/20

| Class 7B | Nondischargeable General Unsecured Claims. These Claims include the penalty and interest upon that penalty portion of the Claim of the Internal Revenue Service. | YES | Class 7B creditors will receive quarterly payment from the Funding Sources, sharing pro rata treatment with Class 7A, 7C and 7D creditors, until the Debtors have funded the Plan up to the Completion Amount. If the Debtors make the New Value Buyback, that payment may also be shared pro rata between general unsecured classes. No interest will be paid to this Class. |
|---|---|---|---|
| Class 7C | Friedman Claims. These Claims include the Claim of Kenneth and Randi Friedman, purportedly $259,360.00 according to the Friedmans' Proof of Claim. | | The Debtors have objected to the Friedman Claims. Pending resolution of the Debtors' objection, the Debtors will escrow the portion of each payment to Class 7C creditors. Upon resolution of the Debtors' objection, escrowed monies will be paid to Class 7C consistent with the outcome of the objection. Class 7C creditors will receive quarterly payment from the Funding Sources, sharing pro rata treatment with Class 7A, 7B and 7D creditors, until the Debtors have funded the Plan up to the Completion Amount. If the Debtors make the New Value Buyback, that payment may also be shared pro rata between general unsecured classes. |

OMC\4850-8836-4733.v3-5/20/20

| Class 7D | Receiver Claims. These Claims include the Claim of Charles N. Persing as Receiver for HFSL, purportedly $182,986.87 according to the Receiver's Proof of Claim. | YES | The Debtors intend to object to the Receiver Claims. Pending resolution of the Debtors' objection, the Debtors will escrow the portion of each payment to Class 7D creditors. Upon resolution of the Debtors' objection, escrowed monies will be paid, if at all to Class 7D consistent with the outcome of the objection. Class 7D creditors will receive payment from the Funding Sources, sharing pro rata treatment with Class 7A, 7B and 7C creditors, until the Debtors have funded the Plan up to the Completion Amount. If the Debtors make the New Value Buyback, that payment may also be shared pro rata between general unsecured classes. |

### 4.   Class(es) of Interest Holders

Interest holders are the parties who hold ownership interest (i.e., equity interest) in the debtor. If the debtor is a corporation, entities holding preferred or common stock in the debtor are interest holders. If the debtor is a partnership, the interest holders include both general and limited partners. If the debtor is an individual, the debtor is the interest holder. As individual Debtors, no one holds an interest in the Debtors. However individual Debtors must comply with the Code provisions related to retention of their nonexempt property.

The value of the retained interest in non-exempt estate property is $50,000.00. The Debtors will cause the Edward Hovatter Irrevocable Trust to make a New Value Contribution worth $50,000.00 to the Bankruptcy Estates of the Debtors as a contribution of money or

DocuSign Envelope ID: 78475248-E556-4EA2-A354-A8842A5E50A1

money's worth, of reasonably equivalent value to the retained interest, that is necessary for the consummation of the Plan.

The following chart identifies the Plan's treatment of the class of interest holders:

| CLASS# | DESCRIPTION | IMPAIRED | TREATMENT |
|--------|-------------|----------|-----------|
|  |  | (Y/N) |  |
| Class 8 | The Debtors' retained interest in non-exempt estate property. This interest is the non-exempt, realizable equity in the Primary Residence, totaling $50,000.00. | YES | The Debtors will retain all their interests in non-exempt estate property on account of the New Value Contribution of the Edward J. Hovatter Irrevocable Trust. |

## D.    Means of Effectuating the Plan

### 1.    New Value Contribution

The realizable equity in the Primary Residence is the value of the Primary Residence, minus encumbrances, exemptions and costs of sale.  That equity is calculated as follows:

Primary Residence fair market value: $2,155,000.00

Shellpoint Mortgage: $1,900,000.00

Closings costs and 5% commission: $154,000.00

Debtors' §522(d)(1) exemption: $50,300.00

**Net realizable equity: $50,700.00**

The Debtors have obtained a written appraisal of the Primary Residence, which is attached as **EXHIBIT E**.  The valuation gives a value of $2,205,000.00 based upon the assumption that real estate sales in the higher-end residential market have not been materially impacted by the current Coronavirus outbreak.  The appraisal is unable to predict the extent of the downturn in the real estate market, especially since there have been few transactions since the

OMC\4850-8836-4733.v3-5/20/20

Coronavirus outbreak began.  Many commentators fear a collapse in the real estate market,

especially in the New Jersey Shore high-end market.  Due to the impending real estate recession,

the market has already seen a strong downturn, reducing sale prices and increasing sale times.

As a result of market conditions caused by the Coronavirus, the realizable fair market value is

between $50,000.00 to $100,000.00 and least lower than that contained in the appraisal.  A

reasonable $50,000.00 reduction has been used in calculations in the Plan and Disclosure

Statement.

The Bankruptcy Code requires the Debtors to either sell the Primary Residence and

distribute its non-exempt equity to creditors, or obtain a contribution of new value equivalent to

the value of the retained non-exempt equity.  The Debtors have obtained a commitment from the

Edward J. Hovatter Irrevocable Trust to contribute new value equivalent to the non-exempt

equity in the Primary Residence.

The Edward J. Hovatter Irrevocable Trust was established in 2011.  Its assets consist of

five (5) life insurance policies.  The insured on all these policies is Debtor Edward J. Hovatter.

Debtor Kimberly Macaluso Hovatter is the trustee of the trust; her father Michael Macaluso had

previously been co-trustee, but he passed away in early 2020.  Three (3) of the policies are whole

life policies with a total net cash value of approximately $12,000.00.  The other policies are

variable life insurance policies with uncertain surrender values.  Upon Confirmation of the Plan,

the Debtors shall cause the Edward J. Hovatter Irrevocable Trust to designate the Bankruptcy

Estates of the Debtors as primary beneficiary of 40% of the Metlife variable life insurance

policy, account No. x4140 owned by the Edward J. Hovatter Irrevocable Trust.  A true and

correct copy of the financial details of this policy is attached as Exhibit F.

This 40% redesignation of the policy's $125,000.00 death benefit allocates a death benefit of $50,000.00 to the Debtors' Bankruptcy Estates. The Edward J. Hovatter Irrevocable Trust and/or the Debtors shall provide proof of the beneficiary redesignation to any creditor upon written request. The Edward J. Hovatter Irrevocable Trust shall not alter this beneficiary designation unless the New Value Buyback is made. The Debtors and the Edward J. Hovatter Irrevocable Trust shall ensure that the life insurance policy so designated is kept current and is not allowed to lapse. The execution of a beneficiary designation in the Bankruptcy Estates' favor (the "New Value Contribution") shall constitute new value that is money or money's worth, reasonably equivalent to the retained interest, and which is necessary for the consummation of the Plan.

Within 120 days after funds from Funding Sources equal to the Completion Amount have been paid under the Plan, the Debtors may opt to contribute $50,000.00 in excess of the Completion Amount in order to buy back the New Value Contribution (the "New Value Buyback"). The money paid by the Debtors for the New Value Buyback shall be distributed pursuant to the Plan. Upon distribution of the New Value Buyback funds, the Edward J. Hovatter Irrevocable Trust may change the beneficiary designation of any life insurance it owns and all Debtors' duties to the Edward J. Hovatter Irrevocable Trust imposed by the Plan are discharged.

## 2.    Completion Amount

In order to confirm an individual chapter 11 plan of reorganization, the Plan must:

- Meet the Best Interest of Creditors test. The liquidation analysis showing the Plan is in the best interest of creditors is found in Part IV.B, below. This liquidation

28

DocuSign Envelope ID: 78475248-E556-4EA2-A354-A8842A5E59A1

analysis shows that in a liquidation, general unsecured creditors would receive no payment at all.

- Meet the Disposable Income Test: Either pay in full all general unsecured claims of objecting creditors or distribute an amount equivalent to the Debtors' projected disposable income pursuant to 11 U.S.C.§1325(b)(2) for the period of the plan. 11 U.S.C. §1129(a)(15). A Projected Disposable Income Report for the Plan period is attached as **EXHIBIT C**. The total projected disposable income is the sum of the "Net excess/(deficit) available for claims" in Exhibit C, which totals $503,722.00.

- Obey the Absolute Priority Rule or the New Value Exception: Either pay in full all unsecured creditor classes or make a contribution of new value equivalent to the value of non-exempt estate property under 11 U.S.C. §541. 11 U.S.C. §1129(b)(2)(B). The value of non-exempt estate property retained by the Debtors is $50,000.00. The Debtors will retain this interest on account of the New Value Contribution made by the Edward J. Hovatter Irrevocable Trust.

This Plan will pay the lowest amount that meets all these requirements, defined as the "Completion Amount." The Completion Amount will be the amount that passes the Disposable Income Test unless valuation of the Primary Residence requires a New Value Contribution greater than the total disposable income over 5 years.

Because the Plan's Completion Amount will be determined by the Disposable Income Test, the Plan will be completed within 5 years of Confirmation, or sooner if Funding Sources aside from the Debtors' disposable income become available. After the Debtors have distributed funds pursuant to the Plan equaling the Completion Amount, the Debtors may, within 120 days,

DocuSign Envelope ID: 78475248-E556-4EA2-A354-A8842A5E59A1

contribute $50,000.00 to effectuate the New Value Buyout.  These funds will be distributed
pursuant to the Plan.

### 3. Funding for the Plan

The Plan will be funded by a waterfall mechanism.  Numerous funding sources will be
applied to the Classes in the order laid out in the Plan.  Funding will be disbursed to each Class
pursuant to its treatment in the Plan, in the order laid out in the Plan.  Upon full payment of a
Class pursuant to the Plan, the next class in order will begin to receive funds.  Funding sources
(the "Funding Sources") will be paid out pursuant to the Plan quarterly, as they become available
for disbursement in a particular quarter, until the total amount disbursed under the Plan reaches
the Completion Amount:

First, any net proceeds from the sale of the Hammonton Property, after full payment of
all liens, encumbrances, closing and transaction costs.

Second, any federal or state tax refund for tax years 2017 through 2024 obtained by the
filing of a tax return or amendment of a filed return.  Any tax refunds that become available
during performance of the Plan will first be used to offset prepetition tax liability.

Third, the net proceeds of any Affirmative Litigation.  The Debtors, in their sole
discretion may prosecute or settle any and all claims, causes of action, cross-claims and
counterclaims of any kind or nature whatsoever, which the Debtors may possess against third
persons including, without limitation, Bankruptcy Code created causes of action.  Any recovery
on account of the successful prosecution, or settlement, of any such claims against third persons
or Bankruptcy Claims shall be used to fund obligations under the Plan.  Certain administrative

30

expenses may be paid, with court approval, from the proceeds of Affirmative Litigation taken on

a contingency basis or by substitute contingency counsel, reducing the net proceeds.

Fourth, any funds available to Bankruptcy Estates pursuant to the New Value

Contribution or New Value Buyback.

Fifth, any Disposable Income of the Debtors, paid monthly.

**4.**           **Sale of the Hammonton Property**

The Debtors have an executed agreement of sale for the Hammonton Property.  The

agreement of sale provides for the sale of the Hammonton Property to disinterested non-insiders

Anthony and Dorothy Peseller for a total price of $335,000.00.  The buyers required the Debtors

finish the basement as a condition of sale.  In order to obtain the agreement of sale, the Debtors

employed Cedar Design LLC to perform repairs on the Hammonton Property's basement.  The

Debtors will seek Court approval of the payment of Cedar Design and the Debtors' realtor Albert

Casalnova as administrative expenses, and will pay these administrative expenses out of the

proceeds of the sale on the Effective Date.  The Court authorized the sale free and clear of liens

pursuant to 11 U.S.C. §363(f), with the liens attaching to the proceeds of sale, pursuant to an

April 28, 2020 Order, attached as **EXHIBIT D**.

The sale is scheduled to close on or before May 29, 2020: after the filing of this

Disclosure Statement but before Confirmation.  Upon closing, the Court has authorized the title

company to apply proceeds to: (1) pay costs of closing, (2) pay the secured tax Claim of the

Town of Hammonton in full at closing, (3) pay the Secured Claim of Republic Bank in full at

closing, (4) transfer $56,000.00 to Secured Creditor 360 Capital to be held in escrow until the

earlier of Confirmation or June 30, 2020, at which point the funds can be applied in full

31

satisfaction of the Creditor's Claim, (5) escrow any remaining proceeds with the title company, to be transferred to the Debtors upon Confirmation and paid pursuant to the Plan.

Confirmation of the Plan shall constitute authority for the title company, 360 Capital and the Debtors to transfer, apply and/or pay proceeds pursuant to the April 28, 2020 Order and the Plan.  Any capital gains or other taxes attributable to the sale will be paid in accordance with the law.  The Debtors' failure to sell the Hammonton Property pursuant to the Plan shall not be a default under the Plan.

5.        **Illustration of Application of Funding Sources**

This is an example for illustrative purposes only.  The actual disbursements under the Plan may differ as various Funding Sources become available at different times.

The Plan obligates the Debtors to make quarterly payments of all Funding Sources that become available for disbursement during that quarter, until the amount distributed through the Plan reaches the Completion Amount.

In a hypothetical first quarter after the Effective Date of the Plan, the Debtors' monthly disposable income  is projected to be approximately $9,000.00.  If a portion of the Affirmative Litigation produces net proceeds of $50,000.00 during that quarter, they Debtors will then distribute $27,000.00 (representing a quarter's worth of disposable income) plus $50,000.00 in Affirmative Litigation proceeds.  The Debtors will distribute this $77,000.00 to the highest-priority Class of Claims or Creditors that has not been paid in full, reducing the balance due to that Class accordingly.

Application of the various Funding Sources, potentially in large lump-sum distributions, will allow the Debtors to pay creditors in order more quickly than if they distributed only

32

DocuSign Envelope ID: 78475248-E556-4EA2-A354-A8842A5E69A1

disposable income.  Once the Debtors have distributed an amount equal to the Completion

Amount, the Debtors will have completed the Plan and will be eligible to receive a discharge.  At

that point the Debtors will have 120 days to make the New Value Buyback.  If they opt to do so,

the $50,000.00 is a Funding Source that will be distributed pursuant to the plan.

**6.** **Post-confirmation Management**

The Reorganized Debtors shall act as the Managers for their own affairs post-

confirmation.  The Reorganized Debtors shall not be compensated for their services as managers.

**7.** **Disbursing Agent**

Kimberly Macaluso Hovatter shall act as the Debtors' disbursing agent for the purpose of

making all distributions provided for under the Plan. The Disbursing Agent shall not be

compensated, or bonded.

**E.** **Other Provision of the Plan**

**1.** **Executory Contracts and Unexpired Leases**

The Plan provides that all Executory Contracts and Unexpired Leases, except for those

specifically assumed by the Debtors in writing or previously assumed by Court Order, shall be

deemed rejected.  The Debtors will determine by the Confirmation Date which contracts, if any,

they intend to assume.  Hovatter will assume Hovatter's membership and status as Managing

Member of HFSL.  All proofs of claim with respect to claims arising from said rejection must be

filed with the Bankruptcy Court within the earlier of (i) the date set forth for filing claims in any

order of the Bankruptcy Court approving such rejection or (ii) thirty (30) days after the

Confirmation Date. Any such claims, proofs of which are not filed timely, will be barred forever

from assertion.

**2.** **Changes in Rates Subject to Regulatory Commission Approval**

OMC\4850-8836-4733.v3-5/20/20

DocuSign Envelope ID: 7847534B-EE56-4EA2-A354-A8842A5E50A1

This Debtors <u>are not</u> subject to governmental regulatory commission approval of their rates.

### 3.    Retention of Jurisdiction

The Bankruptcy Court will retain jurisdiction as provided in Section III(c) of the Plan.

### 4.    Procedures for Resolving Contested Claims

The Proponent has reviewed the claims that have been filed. The Proponent intends to object or cause the Debtors and/or Disbursing Agent to object to the following number and amounts of claims in each class: Class 7C General Unsecured Claim of Randi and Kenneth Friedman, and Class 7D General Unsecured Claim of Charles N. Persing, as Receiver for Hovatter Friedman Saputelli & Levi LLP.  The Debtors and/or the Disbursing Agent shall have sixty (60) days subsequent to confirmation to object to the allowance of claims, except that the Debtors and/or the Disbursing Agent shall have one (1) year to object to the Class 7D claim of the Receiver and the Class 7A claim of Madison Ventures LLC and related entities, as those objections are part of a larger multi-claim suit for affirmative recovery as described in the Affirmative Litigation provision.

### 5.    Effective Date

The Plan will become effective on the Effective Date, which is the date on which the order of confirmation becomes final.

### 6.    Modification

The Plan Proponent may alter, amend or modify the Plan at any time prior to the Confirmation Date and thereafter as provided in Section 1127(b) of the Bankruptcy Code.

### F.    Tax Consequences of Plan

34

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN
MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN
ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS. The following disclosure of possible
tax consequences is intended solely for the purpose of alerting readers to possible tax issues this
Plan may present to the Debtors. The Proponent CANNOT and DOES NOT represent that the
tax consequences contained below are the only tax consequences of the Plan because the Tax
Code embodies many complicated rules which make it difficult to state completely and
accurately all the tax implications of any action.

The following are the tax consequences that the Plan will have on the Debtors' tax
liability: the Debtors do not expect any tax liability in connection with the Plan.

**G.    Risk Factors**

The following discussion is intended to be a non-exclusive summary of certain risks
attendant upon the consummation of the Plan. You are encouraged to supplement this summary
with your own analysis and evaluation of the Plan and Disclosure Statement, in their entirety,
and in consultation with your own advisors. Based on the analysis of the risks summarized
below, the Plan Proponent believes that the Plan is viable and will meet all requirements of
confirmation:  However, the Debtors could be unable to obtain tax refunds, could lose
completely the Affirmative Litigation, and may not opt to make the New Value Buyout, in which
case, no proceeds from that source would become available to unsecured creditors.


# IV.

# CONFIRMATION REQUIREMENTS AND PROCEDURES

DocuSign Envelope ID: 78475348-E556-4EA2-A354-A8842A5E59A1

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THIS PLAN
SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON
CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX. The following
discussion is intended solely for the purpose of alerting readers about basic confirmation issues,
which they may wish to consider, as well as certain deadlines for filing claims. The proponent
CANNOT and DOES NOT represent that the discussion contained below is a complete summary
of the law on this topic.

Many requirements must be met before the Court can confirm a Plan. Some of the
requirements include that the Plan must be proposed in good faith, that creditors or interest
holders have accepted the Plan, that the Plan pays creditors at least as much as creditors would
receive in a Chapter 7 liquidation, and that the Plan is feasible. These requirements are <u>not</u> the
only requirements for confirmation.

## A.      Who May Vote or Object

### 1.      Who May Object to Confirmation of the Plan

Any party in interest may object to the confirmation of the Plan, but as explained below
not everyone is entitled to vote to accept or reject the Plan.

### 2.      Who May vote to Accept/Reject the Plan

A creditor or interest holder has a right to vote for or against the Plan if that creditor or
interest holder has a claim that is both (1) allowed or allowed for voting purposes and (2)
classified in an impaired class.

#### a.      What is an Allowed Claim/Interest

As noted above, a creditor or interest holder must first have an <u>allowed claim or interest</u>
to have the right to vote. Generally, any proof of claim or interest will be allowed, unless a party

36

in interest brings a motion objecting to the claim. When an objection to a claim or interest is

filed, the creditor or interest holder holding the claim or interest cannot vote unless the Court,

after notice and hearing, either overrules the objection or allows the claim or interest for voting

purposes.

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE WAS

JANUARY 23, 2020.

A creditor or interest holder may have an allowed claim or interest even if a proof of

claim or interest was not timely filed. A claim is deemed allowed if (1) it is scheduled on the

Debtors' schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and

(2) no party in interest has objected to the claim. An interest is deemed allowed if it is scheduled

and no party in interest has objected to the interest.

### b.    What is an Impaired Claim/Interest

As noted above, an allowed claim or interest only has the right to vote if it is in a class

that is <u>impaired</u> under the Plan. A class is impaired if the Plan alters the legal, equitable, or

contractual rights of the members of that class. For example, a class comprised of general

unsecured claims is impaired if the Plan fails to pay the members of that class 100% of their

claim plus interest.

In this case, the Proponent believes that all Classes are impaired and that holders of

claims in each of these classes are therefore entitled to vote to accept or reject the Plan. Parties

who dispute the Proponent's characterization of their claim or interest as being impaired or

unimpaired may file an objection to the Plan contending that the Proponent has incorrectly

characterized the class.

### 3.    Who is <u>Not</u> Entitled to Vote

37

The following four types of claims are <u>not</u> entitled to vote: (1) claims that have been disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to Code Section 507(a)(1), (a)(2), and (a)(8); and (4) claims in classes that do not receive or retain any value under the Plan. Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Code Section 507(a)(1), (a)(2), and (a)(7) are not entitled to vote because such claims are not placed in classes and they are required to receive certain treatment specified by the Code. Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan. EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### 4.    Who Can Vote in More Than One Class

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the claim and another ballot for the unsecured claim.

### 5.    Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting classes, as discussed later in Section (IV.A.8.).

### 6.    Votes Necessary for a Class to Accept the Plan

A class of claims is considered to have accepted the Plan when more than one-half ($^1/_2$) in number and at least two-thirds ($^2/_3$) in dollar amount of the allowed claims that actually voted,

OMC\4850-8836-4733.v3-5/20/20

voted in favor of the Plan. A class of interests is considered to have accepted the Plan when at least two-thirds ($^2/_3$) in amount of the allowed interest-holders of such class which actually voted, voted to accept the Plan.

### 7.    Treatment of Non-accepting Classes

As noted above, even if <u>all</u> impaired classes do not accept the proposed Plan, the Court may nonetheless confirm the Plan if the non-accepting classes are treated in the manner required by the Code. The process by which non-accepting classes are forced to be bound by the terms of the Plan is commonly referred to as "cramdown". The Code allows the Plan to be "crammed down" on nonaccepting classes of claims or interests if it meets all consensual requirements except the voting requirements of Section 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan as referred to in 11 U.S.C. §1129(b) and applicable case law.

### 8.    Request for Confirmation Despite Nonacceptance by Impaired Class(es)

The party proposing this Plan asks the Court to confirm this Plan by cramdown on impaired classes if any of these classes do not vote to accept the Plan.

### B.    Liquidation Analysis

Another confirmation requirement is the "Best Interest Test", which requires a liquidation analysis. Under the Best Interest Test, if a claimant or interest holder is in an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value not less than the amount such holder would receive or retain if the Debtors' assets were liquidated under Chapter 7 of the Bankruptcy Code.

39

In a Chapter 7 case, the Debtors' assets are usually sold by a Chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien. Administrative claims are paid next. Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims. Finally, interest holders receive the balance that remains after all creditors are paid, if any.

In order for the Court to be able to confirm this Plan, the Court must find that all creditors and interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a Chapter 7 liquidation. The Plan Proponent maintains that this requirement is met here because each creditor is receiving at least as much as they would receive if the Debtors' assets were simply liquidated.

Below is a chart showing the liquidation value of the Debtors' assets. Because of the large amount of Priority debt, general unsecured creditors would receive nothing in a liquidation. In the Plan, general unsecured creditors may receive an estimated 8% payment, and an additional 9% payment if the Debtors elect to make the New Value Buyback. Therefore, creditors are receiving a better distribution than they would have received in a Chapter 7 liquidation.

| **Assets** | | |
|---|---|---|
| | Primary Residence | $ 2,155,000.00 |
| | Minus:  1st Mortgage | $ (1,900,000.00) |
| | Less:  Commissions plus Debtors' exemption | $ (204,300.00) |
| | **Primary Residence Net Equity** | **$ 50,700.00** |
| | | |
| | Hammonton Property | $ 335,000.00 |
| | Minus: Township of Hammonton Tax Claim | $ (3,422.92) |
| | Minus: 360 Capital Secured Claim | $ (54,400.08) |
| | Minus: Republic Bank Secured Claim | $ (238,000.00) |
| | Less: Commissions and Closing Costs | $ (21,750.00) |
| | Less: Cedar Design repair payment | $ (14,991.24) |
| | **Hammonton Property Net Equity** | **$ 2,500.00** |
| | | |

DocuSign Envelope ID: 78475248-E556-4EA2-A354-A8842A5E59A1

|  |  |  |
|---|---|---|
|  | Affirmative Litigation | $  383,000.00 |
|  | (Less costs to prosecute) | $ (120,000.00) |
|  |  |  |
|  | **Total Assets** | **$ 435,700.00** |
|  |  |  |
| **Liabilities** |  |  |
|  | Priority Claims: |  |
|  | Chapter 11 admin. Expenses | $ 237,091.24 |
|  | Other priority claims | $ 240,613.57 |
|  | Total priority claims | $ 477,704.81 |
|  |  |  |
|  | Amount available for unsecured claims: | $ 0.00 |
|  | (total assets minus priority claims)[1] |  |
|  |  |  |
|  | Total general unsecured claims | $ 556,391.82 |
|  |  |  |
|  | **Chapter 7 Analysis:** |  |
|  |  |  |
|  | Assets | **$ 435,700.00** |
|  | Less Trustee fees and commissions | **$ 30,000.00** |
|  | Estimated dividend in Chapter 7:   0% | **$ 0.00** |

**C.      Feasibility**

Another requirement for confirmation involves the feasibility of the Plan, which means

that confirmation of the Plan is not likely to be followed by the liquidation or the need for further

financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless

such liquidation or reorganization is proposed in the Plan.

There are at least two important aspects of a feasibility analysis. The first aspect

considers whether the Debtor will have enough cash on hand on the Effective Date of the Plan to

pay all the claims and expenses that are entitled to be paid on such date. The Plan Proponent

maintains that this aspect of feasibility is satisfied as, as expenses which must be paid on the

effective date are minimal: Trustee fees and court costs which must be paid through the plan total

---

[1] Assumes stated recoveries.  Could be substantially lower depending on the outcome of the Affirmative
Litigation.

OMC\4850-8836-4733.v3-5/20/20

DocuSign Envelope ID: 7847524B-F556-4EA2-A354-A8842A5E50A1

less than $1,000.00.  The Debtors have sufficient cash on hand to pay this amount on the

effective date.

The second aspect considers whether the Proponent will have enough cash over the life of

the Plan to make the required Plan payments.  As projected in Exhibit C, the Debtors anticipate

their disposable income growing over the Plan period, allowing the Debtors to attain payment of

the Completion Amount by various combination of the Funding Sources, as they become

available.  If certain Affirmative Litigation recoveries are less than projected, the Debtors'

Disposable Income is still sufficient to pay the Completion Amount into the Plan.

The Plan Proponent contends that Debtor's plan is feasible in light of the financial

records maintained by the Debtor prior to and during the pendency of the bankruptcy case.

Accordingly, the Plan Proponent believes, on the basis of the foregoing, that the Plan is feasible.

## V.

### EFFECT OF CONFIRMATION OF PLAN

**A.    Discharge**

The Plan provides that upon completion of all payments under the Plan, the Debtors shall

be discharged of liability for payment of debts incurred before confirmation of the Plan, to the

extent specified in 11 U.S.C. § 1141. However, any liability imposed by the Plan will <u>not</u> be

discharged. If Confirmation of the Plan does not occur or if, after Confirmation occurs, the

Debtors elect to terminate the Plan, the Plan shall be deemed null and void. In such event,

nothing contained in the Plan shall be deemed to constitute a waiver or release of any claims

against the Debtors or their estate or any other persons, or to prejudice in any manner the rights

of the Debtors or their estate or any person in any further proceeding involving the Debtors or

their estate. The provisions of the Plan shall be binding upon Debtors, all Creditors and all

42

Equity Interest Holders, regardless of whether such Claims or Equity Interest holders are

impaired or whether such parties accept the Plan, upon Confirmation thereof.

### B.    Revesting of Property in the Debtors

Except as provided in the Plan, the confirmation of the Plan revests all of the property of

the estate in the Debtors.  In accordance with Section 1123(b) of the Bankruptcy Code, each

Debtor or Reorganized Debtor shall retain all of their respective Litigation Rights that such

Debtor or Reorganized Debtor may hold against any Person and may enforce, sue on, settle, or

compromise all such Litigation Rights, or may decline to do any of the foregoing with respect to

any such Litigation Rights.

### C.    Modification of Plan

The Proponent may modify the Plan at any time before confirmation. However, the Court

may require a new disclosure statement and/or revoting on the Plan if Proponent modifies the

plan before confirmation.

The Proponent may also seek to modify the Plan at any time after Confirmation so long

as (1) the Plan has not been substantially consummated, (2) no order granting the Debtors a

discharge pursuant to the Plan has been entered <u>and</u> (3) the Court authorizes the proposed

modification after notice and a hearing.  Proponent further reserves the right to modify the

treatment of any Allowed Claims at any time after the Effective Date of the Plan upon the

consent of the Creditor whose Allowed Claim treatment is being modified, so long as no other

Creditors are materially adversely affected.

### D.    Post-Confirmation Conversion/Dismissal

A creditor or party in interest may bring a motion to convert or dismiss the case under

Section 1112(b), after the Plan is confirmed, if there is a default in performance of the Plan or if

43

DocuSign Envelope ID: 78475248-E556-4EA2-A354-A8842A5E59A1

cause exists under Section 1112(b). If the Court orders the case converted to Chapter 7 after the

Plan is confirmed, then all property that had been property of the Chapter 11 estate, except

property included in the Chapter 11 estate under §1115, and that has not been disbursed pursuant

to the Plan, will revest in the Chapter 7 estate, and the automatic stay will be reimposed upon the

revested property only to the extent that relief from stay was not previously granted by the Court

during this case.

OMC\4850-8836-4733.v3-5/20/20

Quarterly fees pursuant to 28 U.S.C. § 1930(a)(6) continue to be payable to the Office of the United States Trustee post-confirmation until such time as the case is converted, dismissed, or closed pursuant to a final decree.

Dated:    5/20/2020

Edward J. Hovatter

Dated:    5/20/2020

Kimberly Macaluso Hovatter

45